UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO MORALES, | ) 1:09-cv-02183-JLT HC |
| Petitioner, | ) ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE CASE |
| FERNANDO GONZALES, Warden, | |
| Respondent. | ) ORDER DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 31, 2009, Petitioner filed his written consent to the jurisdiction of the United States Magistrate Judge for all purposes. (Doc. 4). On May 6, 2010, Respondent likewise filed his written consent to the Magistrate Judge's jurisdiction. (Doc. 7).

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation ("CDCR") serving an indeterminate sentence of sixteen years-to-life pursuant to a judgment of the Superior Court of California, County of Kern (the "Superior Court"). (Doc. 1, Attachment 1). Petitioner was convicted by jury trial of conspiracy to commit petty theft, receiving stolen property, grand larceny, robbery, and carjacking (Cal. Pen. Code § 182, subd. (a)(1)[Count 1]); carjacking (Cal. Pen. Code § 215, subd. (a) [Count 2]); second degree robbery (Cal. Pen. Code § 212.5, subd. (c)[Count 3]); and assault with a deadly weapon (Cal. Pen. Code § 245, subd. (a)(1)[Count 4]). (Id.).

1  Regarding all four counts, the jury found true the prosecution's allegations that Petitioner had
2  committed the crimes for the benefit of, at the direction of, or in association with a criminal street
3  gang. (Cal. Pen. Code § 186.22, subd. (b)(1)). (Id.). As to Counts 1, 2, and 3, the jury also found
4  that Petitioner had personally used a deadly weapon in the commission of the crimes. (Cal. Pen.
5  Code § 12022, subd. (b)(1)). (Id.). Petitioner was sentenced to an indeterminate term of sixteen
6  years-to-life. (Id.).

7        Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth
8  Appellate District (the "5th DCA"), raising as his sole issue the sufficiency of the evidence
9  supporting the gang enhancements as to all four counts. (Id.). On June 2, 2008, the 5th DCA, in an
10 unpublished decision, affirmed Petitioner's conviction. (Id.). Petitioner filed a petition for review
11 in the California Supreme Court, case no. S164999, that was denied on September 17, 2008. (Doc.
12 1, Exh. 3).

13       On December 16, 2009, Petitioner filed the instant petition, raising again his claim that
14 insufficient evidence supported the jury's true finding for the gang enhancements. (Doc. 1).
15 Respondent's answer was filed on May 6, 2010. (Doc. 8). On May 26, 2010, Petitioner filed his
16 Traverse. (Doc. 10).

17       Respondent concedes that the sole ground for relief in the petition has been fully exhausted.
18 (Doc. 8, p. 4).

19                         **FACTUAL BACKGROUND**

20       The Court adopts the Statement of Facts in the 5th DCA's unpublished decision. The court
21 began by stating the evidence supporting the underlying convictions:

22       The victim in this case is Jorge Ruiz and the crimes arise out of an incident that occurred on
         November 14, 2006, around 1:00 p.m. According to Ruiz's testimony, after he completed his
23       work shift at a Camper World warehouse, he went to an abandoned house in the city of Arvin
         to rest before returning home. While Ruiz was resting, three men showed up in a pickup
24       truck, including defendant, Sergio Morales, and Omar Morales.

25       Ruiz stepped outside the house. The three men approached and asked if he was alone,
         Scared, Ruiz told them he was with his girlfriend even though he was alone. Defendant
26       broke away from the group, retrieved a small object from behind the passenger's seat of the
         pickup, and put it in his back pocket. Ruiz was unable to see what the object was.
27

28       The three men then went into the garage where there was a camper shell. Ruiz asked if the
         camper shell was stolen and defendant said yes. Ruiz then helped the men load the camper

shell on the back of their pickup.

Ruiz testified that the three men then got into the pickup and drove about 40 to 50 feet, before stopping and backing up to where Ruiz was standing. Defendant and Sergio got out of the pickup, and defendant asked Ruiz if he had a cell phone. Ruiz said yes and let defendant borrow his phone.

After defendant used Ruiz's phone, he gave it back to Ruiz and started talking to Ruiz about whether he wanted to buy a stereo system for his car. Ruiz said he would like to buy one, and asked defendant for his address so he could go see it. Defendant told Ruiz to get Omar's number.

Ruiz went to the pickup to talk to Omar. Defendant came up behind Ruiz and grabbed him by the neck and pointed a knife in the middle of Ruiz's chest. The knife, which Ruiz identified at trial, was silver and did not have a handle. Defendant told Ruiz "not to move or else."

Defendant directed Sergio to go through Ruiz's pockets and to get everything. Defendant also told Sergio: "Get the driver's license. Just in case he calls the cops, we know where he lives." From Ruiz's person, they took his wallet, money, driver's license, a chain with two pendants, and his car keys. Ruiz estimated that he had $30 or $40 in his wallet and that the pendants were worth $200.

Defendant instructed Ruiz to sit on the ground. Defendant then got into the pickup while Sergio got into Ruiz's car, and they both drove away. Ruiz had a number of items inside his car, including his CD player and speakers, a toolbox containing his tools for school, a volt meter, a box of motor oil, and a backpack containing a digital camera. Ruiz estimated that the total value of the items taken from the car was $1200.

The next day, Sergio, who was driving Ruiz's car, was pulled over and arrested. Ruiz testified that when the car was returned to him, it contained a knife that did not belong to him. The knife has a wooden handle and the blade was painted blue.

Sergio testified that he was arrested in connection with the November 14, 2006, incident and that a case was brought against him. As part of a plea agreement in that case, he agreed to testify truthfully in defendant's trial in exchange for not being tried as an adult.
In his testimony, Sergio substantially confirmed Ruiz's account of the incident. Sergio also testified that between the time they went to the garage and loaded the camper shell on the pickup, he and defendant had a conversation about robbing Ruiz. After the robbed Ruiz, they parked Ruiz's car on the street and went home.

Later that night, Sergio and defendant went back to Ruiz's car and took a number of items from it, including a cell phone, toolbox, stereo, and camera. Sergio and defendant split the items between them. They were planning to take the items to Ventura County. When asked where, Sergio testified: "Everywhere. We used to go sell them. We didn't have a specific place."

Sergio testified that he was originally from Moorpark in Ventura County and that defendant was from Oxnard, which is also in Ventura County, but he did not know where Omar was originally from. Sergio had known defendant and Omar for about two or three months, and they were not related to each other, even though they had the same last name.

Sergio identified a CD belonging to him. It had writing on it that spelled "MPL." Sergio testified that "MPL" stood for "Moorpark Locos," which he described as "some guys that live in Moorpark." Sergio claimed he wrote the letters "MPL" on the CD because that was where

    he came from. He also stated he used to affiliate with the group.

(Doc. 1, Attach., pp. 10-12).

    The 5th DCA's decision then summarized the evidence for the gang enhancements as follows:

Detective Robert Perez of the Oxnard Police Department testified as a gang expert for the prosecution. He was familiar with a gang in Oxnard known as the Colonia Chiques. According to Detective Perez, the Colonia Chiques is a multi-generational gang, originating in the 1930's and 1940's, and currently has about 900 members and associates.

Detective Perez explained that the Colonia Chiques identify with clothing related to the Dallas Cowboys and that the gang's main symbol is a five-pointed star. The Colonia Chiques also identify with the colors blue, gray, and white. Colonia Chiques tattoos commonly include combinations of letters derived from the gang's name, such as "CH", "CO," and "CO Boys." The Colonia Chiques also align themselves withe the Surenos or Southern Hispanic Gangs. To show their alliance with Surenos, the Colonia Chiques identify with the number 13 and sometimes incorporate it into their graffiti.

When shown the knife found in the victim's car, Detective Perez testified that it was "something we would find quite often on a gang member." He explained: "[I]t's easily concealable. It's readily accessible. In this particular case...the blade has been painted blue which is significant if this was possessed by a Colonia Chiques gang member, due to the fact they associate themselves with the color blue."

When questioned about the primary activities of the Colonia Chiques, Detective Perez stated: "They start out with graffiti, burglaries, robberies, auto thefts, carjackings, store robberies, assaults, assault with deadly weapons, up to an including attempted murder and murder." He identified two predicate offenses committed by Colonia Chiques gang members. The offenses, robbery and assault with a deadly weapon, are both enumerated in section 186.22, subdivision (e).

Deputy Perez opined that defendant was an active member of the Colonia Chiques gang based on various factors, including his prior police contacts where he was contacted in the company of other gang member[s], arrests for gang-related crimes, possession of gang-related paraphernalia, and wearing of gang-related attire. Defendant had gang tattoos, including the letter "C" on his biceps, the letter "O" on his shoulder, and a five-pointed star on his chest. A number of gang-related items were seized from defendant's bedroom in his Arvin home pursuant to a search warrant, including a Dallas Cowboys necklace and alarm clock, a blue bandana, and photos of defendant flashing gang signs. Also found in his room were a California identification card for Omar, and a sheet of binder paper with gang writings, including the words "Colonia," "injunction," and the moniker "Jay Dog." The work [sic] "injunction" apparently referred to an injunction that was currently in place against gang members in Oxnard.

Based on the documentation he had on Omar, Deputy Perez opined that Omar had progressed to the point of being an active associate of the Colonia Chiques gang but had not yet become a full member. Omar had been contacted in the presence of other gang members but had fewer contacts than defendant. Deputy Perez also described Omar's gang-related tattoos. On the back of his right hand, he had the number 805, which is the Ventura County area code, and inside the number zero in that tattoo was the letter "S", showing he was aligning himself with the Sureno or Southern gang. In addition, Omar had tattoos spelling the letters "CH" on the web of his left hand, and the word "Chiques" on his left wrist. Photos and writings referencing the Colonia Chiques were also seized from Omar's bedroom in his home in Arvin.

Detective Perez testified that, based on his training and experience and contact with the Ventura County Sheriff's Department, "MPLS" stood for "Moorpark Locos," a criminal street gang in the city of Moorpark. He explained that Moorpark is about 20 miles from the city of Oxnard. However, he was not specifically asked to offer an expert opinion as to Sergio's gang membership.

After being presented with a hypothetical based on the November 14, 2006 incident, Detective Perez opined that the crimes were done for the benefit of a criminal street gang. He explained:

> "[I]t benefits the gang on two factors. It benefits them monetarily and–with the property that they receive from the robbery. And it also benefits the gang itself based on the fear it instills not only in the victim but in the neighborhood and the community which shows that they are a gang or a group of people to be reckoned with."

When questioned whether, based on the facts of the hypothetical, the crimes were done at the direction of a criminal street gang, Detective Perez answered in the affirmative, explaining:

> "There is one gang member giving directions. It is at the direction of a certain gang member. In my experience, most criminal street gangs do not have an extremely structured–extreme structure as far as a president, vice-president, and board or directors. So in that particular case, in that hypothetical, the leader at that point was giving directions to the two other gang members."

It was also Detective Perez' opinion that the crimes were done in association with a criminal street gang because "the crimes were being committed by a known and documented criminal street gang member, which was also in association with other gang members in...the facts that were given."

Detective Perez thought it was significant that the gang member in the hypothetical had the victim's license taken from him. The detective explained:

> "In my experience, what I've seen in cases I've personally investigated, it's quite common for gang members to intimidate witnesses, first of all, to not report the crime entirely. And then afterwards if the crime is reported, continued effort to intimidate the witness not to show up in court to testify or to change their testimony."

Detective Perez further testified that it would not be unusual for a gang based out of one geographical location to commit a crime in another, explaining:

> "Based on my experience and some of the contacts I've had with agencies not only in this county, other counties in other states, we have had gang members from different gangs in the city of Oxnard commit crimes in other jurisdictions.
>
> "Again that goes to gaining as much respect as possible. If they can go and commit a crime which has happened in the city of Las Vegas, for example, whether it be something as minor as graffiti, the people there in Las Vegas, including the gang members, know that the gang from Oxnard has been there.
>
> "And it has also been documented where there's been more violent crimes. Again they do not keep to a geographical location just because–they don't reach the end of the street and say, 'That's my border. I can't go any further.' It actually becomes more respected if they can commit a crime elsewhere."

(Doc. 1, Attachment).

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant proceedings were initiated by the filing of the original petition on December 16, 2009, after the enactment of the AEDPA, and thus this case is governed by the AEDPA.

**II. Legal Standard of Review**

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

The first prong of federal habeas review involves the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1). This prong pertains to questions of law and mixed

questions of law and fact. Williams v. Taylor, 529 U.S. at 407-410; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405. A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). Section 2254(d)(1)'s reference to "clearly established Federal law" refers to "the governing legal principle or principles set forth by [the Supreme Court] at the time a state court renders its decision." Lockyer v. Andrade, 538 U.S. at 64; Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005).

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

      To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

      The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque,

555 F.3d 830, 835 (9th Cir. 2009).

### III. Review of Petitioner's Claim.

The instant petition itself alleges the following ground for relief:

**Ground One   Petitioner was deprived of his federal due process rights because the evidence presented at trial did not support the jury's finding as to the gang enhancements for all four counts**

Petitioner contends that his federal due process rights to a fair trial were violated when the jury found true the prosecution's allegations that all four crimes for which Petitioner was convicted were committed for the benefit of, at the direction of, or in association with a criminal street gang. (Doc. 1, Attachment).  This contention is without merit.

A. <u>Standard of Review For Sufficiency of the Evidence.</u>

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

<u>Jackson</u>, 443 U.S. at 319; see also <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  <u>Jackson</u>, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  <u>Id</u>. at 324, n. 16.[1]

Moreover, when a federal court undertakes collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1), the federal court's inquiry is even more limited: the only question is whether the state court's decision was contrary to or reflected an unreasonable application of <u>Jackson</u> to the facts of a particular case.  E.g., <u>Emery v. Clark</u>, 643 F.3d 1210, 1213-14 (9th Cir. 2011); <u>Juan H. V. Allen</u>, 408 F.3d 1262, 1274-75

---

[1] In reviewing sufficiency of evidence claims, California courts expressly follow the standard enunciated in <u>Jackson</u>. See <u>People v. Johnson</u>, 26 Cal.3d 557, 575-578 (1980); see also <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992).

1  (9th Cir. 2005).[2]

2  This Court must presume the correctness of the state court's factual findings. 28 U.S.C.
3  § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness
4  applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v.
5  Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to
6  state court determinations of legal questions or mixed questions of law and fact, the facts as found by
7  the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455
8  U.S. 539, 597 (1981).

      B. <u>Sufficient Evidence Was Presented On The Gang Enhancements</u>.

           1. <u>The Elements of the Enhancement</u>.

California Penal Code §186.22, subd. (b)(1), provides for an enhanced consecutive sentence when "any person is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...." Cal. Pen. Code §186.22(b)(1); See California Jury Instructions–Criminal ("CALJIC"), 6th Ed., No. 17.24.2 (2011).[3] Thus, the two elements of the gang enhancement are that defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang"; and, second, that the defendant committed the crime "with the specific intent to promote, further, or assist" in criminal conduct by gang members. Bonilla v. Adams, 423 Fed. Appx. 738 (9th Cir. 2011)(unpublished). The specific intent required for the enhancement is not the specific intent to benefit the gang, but rather to promote, further, or assist in *any* criminal conduct by gang members. E.g., People v. Morales, 112 Cal.App.4th 1176, 1198 (2003); People v. Leon, 161 Cal.App.4th 149, 163 (2008).

In order to establish that a group is a criminal street gang within the meaning of the sentence enhancement, the prosecution must prove: (1) the group is an ongoing association of three or more

---

[2] Thus, Petitioner's request that this Court conduct a de novo review of his sufficiency claim is unfounded. (Doc. 10, p. 8).

[3] At trial, the jury was duly instructed as to the elements of Cal. Pen. Code 188.22, using CALJIC No. 17.24.2. (Clerk's Transcript on Appeal, Vol. I ("CDI"), pp. 264-265).

persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal activity. People v. Bragg, 161 Cal.App. 4th 1385, 1399-1400 (2008); In re Alexander L., 149 Cal.App.4th 605, 610-611 (2007). A "pattern of criminal gang activity" is defined as gang members' individual or collective commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more enumerated predicate offenses during a statutorily defined time period. People v. Duran, 97 Cal.App.4th 1448, 1457 (2002). Gang evidence, including expert testimony, is relevant and admissible to prove the elements of participation in a criminal street gang either as a substantive offense or as a sentence enhancement. People v. Williams, 170 Cal.App.4th 587, 609 (2009).

In Briceno v. Scribner, 555 F.3d 1069 (9th Cir. 2009), the Ninth Circuit, construing Pen. Code § 186.22(b)(1), had held that evidence that a gang member's commission of armed robberies with another gang member, combined with testimony from a gang expert explaining in hypothetical terms how those acts could advantage the gang, while useful for determining the first element of the gang enhancement statute, "sa[id] nothing about [defendant's] specific intent in committing the robberies." Briceno, 555 F.3d at 1079.

However, in People v. Albillar, 51 Cal.4th 47 (2010), the California Supreme Court specifically rejected the Ninth Circuit's conclusion that expert testimony "deal[ing] almost exclusively with hypotheticals [does] not provide any direct or circumstantial evidence of [defendant's] own intent." Albillar, 51 Cal.4th at 68. Rather, the state high court held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." Id. A state court's interpretation of state law is binding on a federal court sitting in habeas corpus. Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602 (2005). Thus, the California Supreme Court's interpretation of § 186.22, as reflected in Albillar, is binding on this Court in this case. Bonilla, 423 Fed. Appx. at

740.[4]

          2.   <u>Sufficient Evidence Was Presented To Support The Enhancements</u>.

In this case, sufficient evidence was presented upon which a reasonable juror could have found that Petitioner committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang.

In rejecting Petitioner's claim of insufficiency, the 5th DCA reasoned as follows:

> As indicated above, defendant claims there was insufficient evidence to show that the current offenses were gang related. He places strong reliance on the facts that defendant and his companions did not advertise any gang involvement (such as yelling gang slogans or flashing gang signs) during the November 14, 2006, incident, the crimes did not occur in Colonia Chiques territory, and the victim was neither a gang member nor did he suspect the crimes against him were gang related. In defendant's view, Detective Perez's conclusions about the gang-related nature of the crimes were nothing but sheer speculation and conjecture.
>
> We disagree with defendant's assessment of Detective Perez's testimony. It is entirely proper for a qualified expert as Perez is here, when presented with hypothetical scenarios "properly rooted in the evidence presented at trial" to testify how particular criminal conduct may enhance a gang's reputation or how a gang may use proceeds from a crime to further other criminal activity. Such matters are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." [Citations omitted].
>
> ...
>
> Here, Detective Perez's opinion was coupled with evidence that the crimes were jointly committed by a member and associate of the Colonia Chiques gang, and an admitted affiliate of the Moorpark Locos, another gang based in Ventura County. Detective Perez explained how the types of crimes committed in this case would benefit the gang monetarily and enhance the gang's reputation by instilling fear in the community. His explanation was bolstered by evidence that defendant and Sergio were planning to sell the items they stole in Ventura County. In addition, there was evidence that defendant traveled to Oxnard (i.e., Colonia Chiques territory) every couple weeks. Detective Perez also opined that it was not unusual for gang members to commit crimes outside their territory and was yet another means of enhancing a gang's reputation. Defendant's use of intimidation tactics against the victim was also consistent with gang activity as described by the expert.
>
> Considering the expert testimony in conjunction with the remaining evidence, jurors reasonably could have concluded that what took place here was more than merely three people, who happened to be gang members or associates, committing crimes as a group "on a frolic and detour unrelated to the gang." Although there was no evidence of overt indications of gang affiliation or gang-related motives, jurors reasonably could have determined that [ ] news of defendant's and his accomplices' crimes would spread by word of mouth, and the proceeds would benefit the gang monetarily, particularly in light of evidence of defendant's frequent trips to Oxnard and plans to sell the stolen items in Ventura County. Accordingly, jurors reasonably could have concluded both the the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, and that defendant had the

---

[4] Accordingly, Petitioner's reliance on <u>Briseno</u> and its progeny, cited in his Traverse, which was filed before <u>Albillar</u> was decided, is misplaced. (Doc. 10, p. 7).

> specific intent to promote, further, or assist in any criminal conduct by gang members. This case thus is clearly distinguishable from situations in which the defendant's criminal history and gang affiliation constituted the only evidence a crime was gang related, or the only crime consisted of passive conduct by a lone individual and the expert's testimony did not merely give meaning to the defendant's actions, but instead amounted to personal belief as to the defendant's subjective intent.

(Doc. 1, Attach., pp. 18-20)(Citations omitted).

The Court agrees with the state court that a reasonable juror could have inferred that Petitioner was committing the crimes for the benefit of, at the direction of, or in association with the Colonia Chiques. In People v. Morales, supra, the California court held that sufficient evidence to support the gang enhancement had been presented where it was shown that defendant intended to commit certain robberies, that he intended to commit them in association with two other individuals whom he knew to be members of the same gang as defendant, and that he intended to aid and abet the other two gang members in committing the crime. As the Court of Appeal held, "It was fairly inferable that he intended to assist criminal conduct by his fellow gang members." Morales, 112 Cal.App.4th at 1198.

Similarly, in Leon, the Court again found sufficient evidence to support the gang enhancement where there was evidence that defendant intended to commit the charged crimes, that he intended to commit the crimes in association with an individual he knew to be a member of his gang: "From this evidence, the jury could reasonably infer that Leon harbored the 'specific intent to promote, further, or assist in any criminal conduct by gang members." Leon, 161 Cal.App.4th at 163.

Here, as the 5th DCA correctly noted, there was ample evidence that Petitioner had the specific intent to commit all four charged crimes, and that he intended to commit those crimes along with Sergio and Omar, whom Petitioner knew to be associated either with Petitioner's own gang or with another gang. Thus, the jury could have reasonably inferred that Petitioner harbored the requisite specific intent to "promote, further, or assist in any criminal conduct by gang members."

Albillar, 51 Cal.4th at 68.[5] This reasonable inference remains unrebutted and cannot be overcome simply by Petitioner's arguments to the contrary.

In his Traverse, Petitioner essentially repeats the arguments made in his state court filings, i.e., that the prosecution's evidence of Petitioner's specific intent vis-a-vis the gang enhancement was based on nothing more than mere speculation. (E.g., Doc. 10, pp. 9-13). For example, Petitioner asks how anyone, including the victim, could have known he was acting on behalf of his gang, when "he never made known his moniker, nor the gang that Det. Perez stated he belong[ed] to, i.e., Colonia Chiques Gang." (Doc. 10, p. 11). Also, Petitioner reasons, just because Petitioner used tactics consistent with a gang member was not, without more, sufficient to prove he actually was acting on behalf of a gang. (Id.).

However, Petitioner's analysis is premised upon the mistaken assumption that this Court will re-weigh of all of the evidence presented at trial, essentially acting as a thirteenth juror, and not simply view, as the Court must, the evidence in the light most favorable to the prosecution in order to determine whether the inculpatory evidence presented, standing alone, could justify a reasonable juror in finding the enhancement true beyond a reasonable doubt. As discussed previously, when the evidence is thus viewed in the appropriate light, without considering and weighing all of the evidence presented at trial, it is difficult to conceive how the quantum of evidence could possibly be insufficient under Jackson.

For the foregoing reasons, the Court finds that the state court adjudication of the sufficiency of the gang enhancements as to all four counts was not contrary to nor an unreasonable application of clearly established federal law. Hence, the Court will deny with prejudice the petition for writ of habeas corpus on its merits.

Moreover, the Court declines to issue a certificate of appealability. A state prisoner seeking a

---

[5] As the 5th DCA correctly noted, Petitioner never challenged the sufficiency of the evidence as to the other elements, i.e., that the Colonia Chiques is an "ongoing association of three or more persons with a common name or common identifying sign or symbol," or that it "has as one of its primary activities the commission of one or more of the criminal acts enumerate in [Pen. Code § 186.22]", or that it includes members who either individually or collectively have engaged in a 'pattern of criminal activity' by committed, attempting to commit, or soliciting two or more of the enumerated offenses..." (Doc. 1, Attach., p. 17, n. 3). Thus, the Court need not address the sufficiency of the evidence as to those elements of the gang enhancement.

writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--
>   (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court;  or
>   (B) the final order in a proceeding under section 2255.
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability.  Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Accordingly, the Court DECLINES to issue a certificate of appealability.

**ORDER**

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1. The petition for writ of habeas corpus (Doc. 1), is DENIED with prejudice;

2. The Clerk of the Court is DIRECTED to enter judgment and close the file;

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:  **September 20, 2011**                                    **/s/ Jennifer L. Thurston**
                                                                                    UNITED STATES MAGISTRATE JUDGE